IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JESSICA McWHORTER TEGO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil No.   12-cv-646-CJP |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant.[1] | ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Jessica McWhorter Tego, through counsel, seeks review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).[2]

### A.    Procedural History

Ms. Tego applied for benefits in March, 2006, alleging disability beginning on December 31, 2005.   The application was denied initially and on reconsideration.   After holding a hearing, an ALJ denied the application in August, 2009.   (Tr. 75-84).   The Appeals Council granted review and vacated the decision.   (Tr. 86-89).   The case was

---

[1]  Carolyn W. Colvin was named Acting Commissioner of Social Security on February 14, 2013. She is automatically substituted as defendant in this case. See Fed. R. Civ. P. 25(d); 42 U.S.C. §405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").
[2]  This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c).   See, Doc. 16.

then assigned to ALJ Stuart T. Janney.   After holding another hearing, ALJ Janney

denied the application on November 2, 2010.   (Tr. 22-37).   The Appeals Council denied

review, and the November 2, 2010, decision became the final agency decision subject to

judicial review.   (Tr. 1).   Administrative remedies have been exhausted and a timely

complaint was filed in this Court.

### B.    Issues Raised by Plaintiff

Plaintiff raises several points, including that the ALJ improperly rejected the

opinion of the consultative examiner regarding her ability to crouch and crawl.

Because of this error, she contends, the ALJ's assessment of her residual functional

capacity was not supported by substantial evidence.

### C.    Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the

applicable statutes.[3]   For these purposes, "disabled" means the "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than 12 months."   **42 U.S.C.**

**§423(d)(1)(A).**

---

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. §
423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§
1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   For all intents and purposes relevant to this case, the DIB
and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant
to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.   Most citations herein are to the
DIB regulations out of convenience.

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   **42 U.S.C. §423(d)(3).**

"Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue,* **649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can

perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   **20 C.F.R. §§ 404.1520;** *Simila v. Astrue,* **573 F.3d 503, 512-513 (7th Cir. 2009);** *Schroeter v. Sullivan,* **977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Secretary at step five to show that the claimant can perform some other job.   *Rhoderick v. Heckler,* **737 F.2d 714, 715 (7th Cir. 1984).**   See also, *Zurawski v. Halter,* **245 F.3d 881, 886 (7th Cir. 2001)**(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   The scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether Ms. Tego was, in fact, disabled during the relevant time period, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   **See,** *Books v. Chater,* **91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater,* **55 F.3d 300, 306 (7th Cir. 1995)**).   This Court

4

uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, **402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, **103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, **597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### D.   The Decision of the ALJ

ALJ Janney followed the five-step analytical framework described above. He determined that Ms. Tego had not been engaged in substantial gainful activity since the alleged onset date and that she was insured for DIB through December 31, 2009. He found that plaintiff had severe impairments of status post Burkitt lymphoma, obesity, hernia, diabetes, congestive heart failure, degenerative changes in the knee, degenerative disc disease in the lumbar spine, depression, and anxiety. He found that these impairments did not meet or equal a listed impairment.

The ALJ found that Ms. Tego had the residual functional capacity to perform work at the sedentary exertional level, with limitations. The ALJ determined that Ms. Tego could not do her past work, but, based on evidence from a vocational expert, he

concluded that she was able to do other jobs which exist in significant numbers in the regional and local economies.   (Tr. 22-37).

### E.   The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff.

### 1.   Agency Forms

Plaintiff was born in 1980, and was 25 years old when she allegedly became disabled on December 31, 2005.   She was insured for DIB through December 31, 2009. (Tr. 232).   She said that she became disabled on December 31,2005, because of Burkitt lymphoma.[4]   She had stopped working in June, 2005, because of "transportation problems."   (Tr. 236).

Ms. Tego went to school through the 11th grade.   (Tr. 241).   She worked from 1996 through 2005 as a cashier in fast food restaurants, gas stations and Wal-Mart.   (Tr. 237).

### 3.   Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing before ALJ Janney on September 13, 2010.   (Tr. 1290).

Ms. Tego was 29 years old at the time of the hearing.   She was 5'4" tall and

---

[4] Burkitt lymphoma is a fast growing form of non-Hodgkin's lymphoma.   According to the National Institutes of Health's website, "More than half of those with Burkitt lymphoma can be cured with intensive chemotherapy." http://www.nlm.nih.gov/medlineplus/ency/article/001308.htm, accessed on June 4, 2013.

weighed 270 pounds.   (Tr. 1296).   Her doctor put her on a diet and she lost 30 pounds.

(Tr. 1315).   She got married in 2009, and she lived with her husband and 13 year-old

stepdaughter.   Ms. Tego left school in the 11th grade.   (Tr. 1296-1297).

On December 31, 2005, the alleged date of disability, plaintiff was pregnant with a

daughter.   She was having complications, and, after the baby was delivered, it was

discovered that Ms. Tego had cancer.   (Tr. 1298).   Her cancer was Burkitt lymphoma,

and it has been in remission since May of 2006.   She was not taking any medications for

her cancer at the time of the hearing.   She testified that her heart was "weakened" by

the chemotherapy.   She had chest pain on exertion.   She was taking Lisinopril for heart

problems.   She also had leg problems, diabetes, a hernia and depression.   She had

sharp pains in her legs and her legs felt weak.   (Tr. 1301-1303).   She had been having

back pain for the past 2 or 3 years.   She had not seen a specialist for that.   (Tr. 1311).

She started having daily headaches about two months before the hearing.   (Tr. 1316).

She was diagnosed with diabetes in May, 2006.   She took insulin 4 times a day,

but her blood sugars were still high, which made her feel weak and tired.   (Tr. 1304).

She had hernia surgery in 2006.   She had an abdominal hernia at the time of the hearing.

Her doctor said she had to get her diabetes under control and lose more weight before it

could be repaired.   (Tr. 1305).

Ms. Tego testified that she could walk for 5 to 10 minutes, and could stand for the

same amount of time.   (Tr. 1302-1303).   She had pain in her back and legs if she sat for

longer than 15 or 20 minutes.   She was able to lift 5 to 8 pounds.   She had no trouble

7

using her hands or fingers.   (Tr. 1312-1313).   She was only able to concentrate for 15 or 20 minutes.   (Tr. 1317).

Plaintiff said that she had depression.   She had anxiety attacks about 3 or 4 times a week.   Her medication made very little difference in her depression and anxiety.   (Tr. 1313).

She lost her medical card for a while, so she was unable to afford her medications. Dr. Jenson stopped treating her when she lost her medical card.   (Tr. 1316).

A vocational expert (VE) also testified.   The ALJ asked him to assume a person who could lift less than 10 pounds frequently and 10 pounds occasionally, sit for a total of 6 out of 8 hours, stand and/or walk for 2 out of 8 hours, and was limited to only occasional postural activities, including crouching and crawling, with no climbing of ladders, ropes and scaffolds and no work at unprotected heights or with dangerous machinery.   She was further limited to work involving only one- and two-step instructions and only minimal close teamwork.   The VE testified that this person could not do plaintiff's past work, but she could do a variety of sedentary, unskilled jobs such as assembler, hand sorter/packer, and machine tender.   (Tr. 1321-1322).   However, if she were unable to crouch or crawl, she would not be able to do those jobs.   The VE testified that, generally, unskilled work requires the ability to occasionally crouch and crawl.   (Tr. 1324).

### 4.   Medical Treatment

In January, 2006, plaintiff was hospitalized for complications related to her

pregnancy.   The baby was delivered by caesarean section.   (Tr. 455-457).

Ms. Tego was diagnosed with Burkitt lymphoma of the abdomen.   She received several cycles of chemotherapy at St. John's Hospital in Springfield, Illinois from January through May, 2006.   (Tr. 545-558).   She was diagnosed with cardiomyopathy in March, 2006.   (Tr. 655-657).   She was hospitalized from March 22, 2006, through April 29, 2006.   During that hospitalization, she was also diagnosed with gall bladder disease.   A cholecystectomy tube was placed.   (Tr. 658-659).   Her gallbladder was removed and a hernia repaired in an open surgical procedure on June 9, 2006.   (Tr. 718-720).

Dr. Jenson first saw Ms. Tego in July, 2006.   She was undergoing rehab in a nursing home.   Her cancer was in remission, but she had cardiomyopathy with decreased ejection fraction and intermittent tachycardia.   She was depressed and had vague suicidal ideation at times.   (Tr. 728-729).   On August 29, 2006, Dr. Jenson noted that she missed some doses of her medication because she had lost Medicaid coverage until September 1.   (Tr. 767).   In December, 2006, she had a large ventral hernia.   She had stopped taking her medications because Effexor was not working.   Dr. Jenson prescribed Xanax.   (Tr. 779-780).

In January, 2007, Dr. Jenson noted that plaintiff had been hospitalized after taking an overdose of Xanax.   She had begun seeing a counselor.   She was still depressed and crying.   (Tr. 778).   She was again hospitalized after taking "a handful of various pills" in September, 2007.   She told Dr. Jenson that she realized that was a mistake, and she

just wanted to "get well and get her daughter back from DCFS."   (Tr. 815-817).

Plaintiff saw Dr. Jenson in April, 2008, and reported that her daughter had died from an infection.   Plaintiff denied suicidal ideation.   She was taking Klonopin.   She had some chest discomfort which she though was anxiety related.   The physical exam was normal except for a large reducible ventral hernia.   She could not afford lab work to assess her diabetes.   Her cardiomyopathy was stable.   (Tr. 811-812).

Ms. Tego was admitted to the hospital in November, 2008, because her diabetes was out-of-control.   (Tr. 804-806).   Dr. Jenson saw her in the office in December, 2008. He noted that her diabetes and depression were worse.   She could not afford counseling.   (Tr. 800-802).

In April, 2009, Ms. Tego was evaluated by Dr. Rao, who had treated her cancer. He noted that she had been in complete remission since June, 2008.   During chemotherapy, she had an echocardiogram which showed an initial low ejection fractions of 35%, but this was shown to be an error.   Thereafter, she had a normal ejection fraction.   (Tr. 875).

In May, 2009, Dr. Jenson noted that her moods were stable and she was in a new relationship.   She was 4 weeks pregnant. (Tr. 872-874).   She later had a miscarriage. (Tr. 909).

Ms. Tego was hospitalized because her diabetes was out-of-control due to noncompliance in October, 2009.   She was now insulin dependent.   Dr. Jenson noted that she had not been able to see him in the office because she had no insurance or

10

income.   She was having the same chronic chest discomfort and palpitations.   The plan
was to get her blood sugars down and give her some insulin samples through the office.
Dr. Jenson gave her information on a clinic for people with no insurance.   (Tr. 906-908).
The day after discharge, she returned to the hospital because she had an acute mental
status change.   She was minimally responsive and a drug screen was positive for
opiates.   Dr. Jenson suspected that her boyfriend gave her an opiate.   He also noted
that she had profound acute depression.   (Tr. 903-904).

In October, 2009, a CT scan of the lumbar spine showed degenerative changes at
L4-5 and L5-S1.   There was a calcified disc protrusion at L5-S1, which appeared rather
old.   (Tr. 900-901).

Dr. James Flaig evaluated plaintiff for her hernia in January, 2010.   She denied
any chest pain or pressure, exercise intolerance, or arrhythmia.   She also denied any
back pain, muscle weakness or myalgia.   She complained of depression.   He
recommended that she hold off on surgery until she lost some weight and her diabetes
was under better control.   He recommended that she wear an abdominal binder to help
with discomfort.   (Tr. 912-913).

An echocardiogram in January, 2010, showed mildly reduced left ventricle
systolic function.   (Tr. 921).

She was admitted to the hospital for uncontrolled diabetes in April, 2010.   She
reduced her dosage of insulin because, when she took it as prescribed, her blood sugar
dropped to 200 to 300, and she had dizziness and numbness.   She was also anxious and

11

depressed, with multiple panic attacks and occasional visual hallucinations.   (Tr. 969-973).   She returned to the emergency room in July, 2010, with hyperglycemia.   The doctor's note indicates that she had "poor control/compliance."   (Tr. 980).

Plaintiff was seen by her oncologist, Dr. Rao, in July, 2010.   She complained of progressive fatigue, generalized weakness, pre-syncopal symptoms, unintentional weight loss of 25 pounds and drenching night sweats.   She had poor blood sugar control.   She was trying to get pregnant, but had several miscarriages.   She said she had reduced activities of daily living related to mobility, and she sometimes used a walker.   (Tr. 1049-1052).   Testing was done to determine whether her cancer had recurred.   CT scans of the chest, abdomen and pelvis were normal, as was blood work, except for high blood sugars.   In August, 2010, she complained of recurrent headaches, so Dr. Rao ordered a CT scan of the head.   (Tr. 1070).   In September, 2010, Dr. Rao reported that her cancer was in complete remission and was likely cured.   Her depression was improved but still present.   She had a normal brain MRI.   She was still having headaches, and she was referred to a neurologist for evaluation.   (Tr. 1080-1083).

### 5.   Medical Records Not Before the ALJ

After the ALJ denied her application, plaintiff submitted additional records to the Appeals Council, which considered them in connection with her request for review. See, Tr. 5.   Thus, the medical records at Tr. 1085-1289, designated by the Appeals Council as Exhibits 32F through 34F, were not before the ALJ.

The medical records at Tr. 1085-1289 cannot be considered by this Court in

12

determining whether the ALJ's decision was supported by substantial evidence. Records "submitted for the first time to the Appeals Council, though technically a part of the administrative record, cannot be used as a basis for a finding of reversible error." *Luna v. Shalala*, **22 F3d 687, 689 (7th Cir. 1994).   See also,** *Getch v. Astrue*, **539 F.3d 473, 484 (7th Cir. 2008).**

### 6.    Treating Doctor's Opinion

On February 13, 2007, Dr. Jenson completed a Physical RFC Questionnaire in which he stated that plaintiff had diagnoses of Burkitt lymphoma, cardiomyopathy, depression and ventral hernia.   Dr. Jenson opined that plaintiff was unable to tolerate even a low stress job because she was depressed, tired easily and had poor tolerance of physical exertion.   He also indicated that plaintiff could sit for a total of less than 2 hours a day and could stand/walk for less than a total of 2 hours a day.   She could not stoop or crouch at all.   (Tr. 792-797).

### 7.    State Agency Consultant's RFC Assessment

In August, 2006, a state agency consultant assessed plaintiff's RFC based on a review of the records.   She opined that plaintiff was able to do work at the sedentary exertional level, limited to only occasional postural activities, but no climbing of ladders, ropes or scaffolds.   She found that she could occasionally crouch and crawl.   The doctor noted that plaintiff had undergone rehab in a nursing home, but said that "it is anticipated that with continuing rehab that she will be able to return to work level previously outlined within 12 mo. [months] of the onset of her illness."   (Tr. 656-663).

13

8.      **Examination by Dr. Chapa**

Dr. Vittal Chapa examined Ms. Tego at the request of the agency in July, 2009. Her main symptoms were back pain, swelling of the legs, vision impairment for which she was supposed to wear glasses, and obesity.   She had shortness of breath on exertion.   Dr. Chapa reviewed medical records which indicated she had been treated for Burkitt lymphoma, which was in remission, and that she had cardiomyopathy with an ejection fraction of 35%.   On exam, she was able to bear weight and ambulate without any aids.   She had a large ventral hernia in the right lower quadrant.   Neurological and motor examinations were normal.   She had no joint redness, swelling, heat or thickening.   She had no paravertebral muscle spasms and flexion of the lumbosacral spine was normal.   Straight leg raising was negative bilaterally.   She had 1+ swelling in her legs.

She had mild difficulty getting on and off the exam table.   She was unable to tandem walk, toe walk, heel walk, or squat and arise.   She was 63 inches tall and weighed 294 pounds.

Dr. Chapa said that her shortness of breath was due to a combination of obesity and cardiomyopathy.   Her back pain was probably also related to obesity.

Dr. Chapa opined that plaintiff could frequently lift 10 pounds and could occasionally lift up to 20 pounds.   She could sit for a total of 8 hours, stand for a total of 5 hours and walk for a total of 3 hours.   She had postural limitations, including that she could never crouch or crawl.   (Tr. 883-893).

14

F.     __Analysis__

The vocational expert's testimony established that, if plaintiff were unable to crouch or crawl, she would be unable to do unskilled, sedentary work.   That kind of work requires the ability to crouch and crawl at least occasionally   (Tr. 1324).

According to Dr. Chapa, who examined her, plaintiff can never crouch or crawl. The state agency consultant, who reviewed records but did not examine her, opined that she was able to occasionally crouch and crawl.

Plaintiff argues that the ALJ erred in accepting the opinion of the state agency consultant and rejecting Dr. Chapa's opinion.   Because of conflicting and inaccurate statements about Dr. Chapa's opinion and the record as a whole, this case must be remanded.

At Tr. 31, the ALJ summarized Dr. Chapa's findings, including his opinion that she could never crouch or crawl.   The ALJ characterized Dr. Chapa's opinion as "generally consistent with the case record" and "consistent with the clinical findings Dr. Chapa reported."   Three pages later, however, the ALJ rejected Dr. Chapa's opinion in favor of the state agency consultant's assessment.   The ALJ characterized the state agency consultant's assessment as "more restrictive" than Dr. Chapa's, which is not entirely accurate.   It was more restrictive with respect to the amount of weight that plaintiff could lift, but it was less restrictive with respect to the crucial issue of ability to crouch and crawl.

The ALJ attempted to distinguish Dr. Chapa's opinion from that of the state

15

agency consultant by saying that "Dr. Chapa did not have the opportunity to consider more recent findings showing a left ventricular ejection fraction of 49 percent." However, both the state agency consultant and Dr. Chapa relied on a record that showed plaintiff had cardiomyopathy with an ejection fraction of 35 percent.   See, Tr. 737, 883. In 2010, testing showed that she had only mildly reduced left valve systolic function and an ejection fraction of 49 percent.   See, Tr. 921.   The state agency consultant's assessment was done in August, 2006.   Dr. Chapa examined plaintiff in July, 2009. Obviously, neither doctor saw the results of the 2010 testing.   Thus, the ALJ's attempt to distinguish between the two assessments on that basis was misguided.

The ALJ also said that the medical evidence of plaintiff's hernia, obesity and degenerative changes was more consistent with the state agency consultant's opinion than with "Dr. Chapa's less restrictive opinion."   This statement contradicts the ALJ's earlier statement that Dr. Chapa's opinion was consistent with the record and with his clinical findings.

The ALJ's determination can be upheld only if it is supported by substantial evidence, which means "evidence a reasonable person would accept as adequate to support the decision."   *Kastner v. Astrue*, **697 F.3d 642, 646 (7th Cir. 2012).**   Further, the ALJ is required to build "an accurate and logical bridge" between the evidence and his conclusion.   *Ibid*.

Here, it is difficult to glean any adequate reason for rejecting Dr. Chapa's opinion in favor of that of the state agency consultant.   20 C.F.R. §404.1527(d) provides that all

16

medical opinions will be evaluated according to the factors set forth in that section.[5]   As

Dr. Chapa did not treat Ms. Tego, his opinion is not entitled to "controlling weight."

***Simila v. Astrue*, 573 F.3d 503, 514 (7ᵗʰ Cir. 2009).**   However, §404.1527(d)(1) provides

that more weight is generally given to the opinion of an examining doctor than to one

who has only reviewed records.   The ALJ is "required to determine the weight a

nontreating physician's opinion deserves" by applying the factors specified in

§404.1527(d)(3) through (d)(6).   ***Simila*, 573 F.3d at 515**.   Those factors are

supportability, consistency, specialization, and any other factor of which the ALJ is

aware.   Here, the ALJ said that Dr. Chapa's opinion was consistent with, i.e., supported

by, his clinical findings and was consistent with the record as a whole.   He did not give

any reason supported by the record for favoring the state agency consultant over Dr.

Chapa.

The Commissioner admits that the ALJ's explanation of why he rejected Dr.

Chapa's opinion was not perfect, but argues that the ALJ reasonably found that the state

agency consultant's opinion was more consistent with the record as a whole.   Doc. 38,

pp. 7-8.   However, her argument completely ignores the ALJ's explicit finding that Dr.

Chapa's opinion was consistent with the record and with his clinical findings.

The Commissioner defends the ALJ's decision by arguing that he relied on lack of

objective evidence of nerve impingement, negative straight leg raising, normal strength

---

[5] The Court refers to the version of 20 C.F.R. §§ 404.1527 that was in effect when the ALJ issued his decision. The agency subsequently amended these regulations by removing paragraph (c) and redesignating paragraphs (d) through (f) as paragraphs (c) through (e). 77 Fed. Reg. at 10656–57 (2012).

and sensation, and the effectiveness of an abdominal binder.   Doc. 38, p. 7.   In fact, while the ALJ did cite these factors, it was in the context of his analysis of the opinion of Dr. Jenson, not that of Dr. Chapa.

The Commissioner also points out that §404.1527(d)(2) requires the ALJ to give "good reasons" for the weight he gives to a treating doctor's opinion, but does not require "good reasons" with respect to an examining doctor.   This is a curious argument.   The suggestion that the ALJ does not have to give "good reasons" for rejecting an examining doctor's opinion flies in the face of the well-established rules that the ALJ may not ignore evidence favorable to the claimant, ***Hughes v. Astrue*, 705 F.3d 276, 277-278 (7ᵗʰ Cir. 2013)**, and must build an "accurate and logical bridge" between the evidence and his conclusion, ***Kastner v. Astrue*, 697 F.3d 642, 646 (7ᵗʰ Cir. 2012).**

Lastly, the Commissioner argues that any error in weighing Dr. Chapa's opinion is harmless since plaintiff has not demonstrated that the ALJ would likely reach a different result regarding her ability to crouch and crawl on remand.   Doc. 38, pp. 8-9. The Commissioner cites ***Spiva v. Astrue*, 628 F.3d 346 (7ᵗʰ Cir. 2010)** in support of her argument, but ***Spiva*** actually undermines her position:

> If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time. But that is not the government's understanding of the doctrine of harmless error, if we may judge    from its brief and oral argument in this case (and not only this case—see, e.g., *Terry v. Astrue*, 580 F.3d 471, 475–77 (7ᵗʰ Cir.2009) (per curiam); *Villano v. Astrue*, 556 F.3d 558, 562–63 (7ᵗʰ Cir.2009) (per curiam); *Craft v. Astrue*, 539 F.3d 668, 675, 678–79 (7ᵗʰ Cir.2008); *Stout v. Commissioner, Social Security   Administration*, 454 F.3d

18

1050, 1054–56 (9th Cir.2006); *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir.2004)). The government seems to think that if it can find enough evidence in the record to establish that the administrative law judge might have reached the same result had she considered all the evidence and  evaluated it as the government's brief does, it is a case of harmless error. But the fact that the   administrative law judge, had she considered the entire record, might have reached the same result does not prove that her failure to consider the evidence was harmless. Had she considered it carefully, she might well have reached a different conclusion.

**Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010).**

Here, it cannot be predicted with great confidence that the agency would reach the same decision on remand.   According to the ALJ, Dr. Chapa's opinion was consistent with the record and with his clinical findings.   The ALJ offered no valid reason for rejecting his conclusion that Ms. Tego could not crawl or crouch.   If she cannot crawl or crouch at least occasionally, she cannot do unskilled sedentary work. Thus, while the ALJ might reach the same conclusion if he evaluated the evidence in the same way as the Commissioner's brief does, he might well reach a different conclusion upon careful consideration of the evidence.   Therefore, this is not case of harmless error.

Because of the ALJ's errors, this case must be remanded.   The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Tego is disabled or that she should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

### F.      Conclusion

The Commissioner's final decision denying Jessica McWhorter Tego's

19

application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATED:   June 6, 2013.**


**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**